IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CITY OF SAN ANTONIO, | § | |
|     *Plaintiff*, | § | |
| | § | |
| *v.* | § | 5:17-CV-01232-OLG |
| | § | |
| TIME WARNER CABLE TEXAS, LLC | § | |
| D/B/A SPECTRUM AND CHARTER | § | |
| COMMUNICATIONS, | § | |
|     *Defendants* | § | |

## PLAINITFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

The CITY OF SAN ANTONIO, hereinafter referred to as "Plaintiff," or "City," files this Plaintiff's First Amended Complaint against TIME WARNER CABLE TEXAS, LLC D/B/A SPECTRUM AND CHARTER COMMUNICATIONS, hereinafter referred to as "Defendant," or "TWC," seeking unpaid franchise fees in excess of One Million Dollars and would show the Court as follows:

## I.
## PARTIES

1. The City of San Antonio is a home-rule municipality chartered and incorporated in Bexar County and situated predominately in Bexar County, Texas.

2. Time Warner Cable Texas LLC is a Delaware corporation with its principal place of business in Connecticut and doing business in Texas and in the City of San Antonio. Time Warner Cable Texas LLC may be served through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th St., Suite 620, Austin, Texas 78701-3136. Time Warner Cable Texas LLC has been served and made an appearance herein and no further service is necessary.

## II.
## JURISDICTION AND VENUE

3.      This Court has jurisdiction because complete diversity of citizenship exists between the parties, *See* 28 U.S.C. § 1332(a), and the amount in controversy is greater than $75,000.  The City states that it seeks monetary relief over One Million Dollars ($1,000,000.00).  The City also seeks judgment for all other relief to which it is justly entitled.

4.      As previously noted, the City is a home-rule municipality pursuant to its City Charter and the laws of the State of Texas and is situated in Bexar County, Texas.  Time Warner is a Delaware corporation with its principal place of business in Connecticut.  It is an indirect subsidiary of Charter Communications, Inc. which is a publicly-held corporation organized in Delaware with its principal place of business in Stamford, Connecticut.  None of TWC's members, or members of its members, are incorporated, reside, or have a principal place of business in Texas.  Because COSA is a Texas home-rule municipality and TWC is a citizen of Delaware, the parties to this cause of action are completely diverse.  *See* 28 U.S.C. § 1332(a)(1).

5.      Venue is proper in the Western District of Texas, San Antonio Division, pursuant to 28 U.S.C. §1391(b)(2) because all or part of the events or omissions forming the basis of the lawsuit occurred in this Judicial District.

## III.
## FACTUAL BACKGROUND

6.      For many years, cable companies were the sole providers of wire-based video programming to city residents.  Until 2005, a cable company wanting to serve customers within a Texas city did so by obtaining a local franchise agreement from that city.  Federal law required a local authority (e.g., a state or local government) to issue a franchise agreement, and Texas law provided for compensation for the use of the city's rights-of way.

7. The City of San Antonio, prior to 2005, negotiated a cable franchise agreement with Defendant and other cable providers. In exchange for access to municipal rights-of-way ("ROW") necessary for the deployment of the cable system infrastructure, TWC and other cable providers paid the City of San Antonio and other municipalities a franchise fee, among other in-kind contributions, including the operation of public, educational and government ("PEG") access channels. These negotiations resulted in what were commonly termed "Municipal Franchise Agreements." Municipal Franchise Agreements commonly included provisions establishing the right of municipal government to conduct audits of the franchise fees paid to the municipality.

8. Because of ever-growing technological capabilities, telecommunications companies now also have the ability to provide video programming. Those companies wanted the local franchise system reformed so they would not have to obtain hundreds of franchises to implement their new technology. Cities wanted to ensure that all technologies and services that use the public ROW would pay a fair and equitable fee for use of the public's land. In addition, cities wanted to ensure they retained police power authority over their ROW and were still able to provide PEG programming to their citizens. As a result, in 2005, the legislature passed Senate Bill 5, which created a new Chapter 66 of the Public Utilities Code.

9. In 2005, the State Legislature passed into law Chapter 66 of the Texas Public Utility Regulatory Act ("PURA" or the "Act"), which fundamentally changed the way cable providers gained access to municipal ROW. Effective September 1, 2005, following the expiration of a Municipal Franchise Agreement, the State of Texas required cable providers to provide cable or video service in a municipality pursuant to a State Issued Certificate of Franchise Agreement ("SICFA") approved by the Texas Public Utility Commission ("PUC").

10.     Chapter 66 requires an entity seeking to provide cable or video programming services in Texas to file an application with the PUC for the SICFA, and requires the PUC to issue a certificate of franchise provided the applicant: (a) agrees to comply with all federal laws and regulations; (b) agrees to comply with all city regulations regarding the use and occupation of the public ROW, including police powers of the city; and (c) provides a description of the service area footprint to be served within the municipality. TEX. UTIL. CODE ANN. §66.003.

11.     A SICFA authorizes a cable provider to use municipal ROWs for its cable infrastructure so long as the cable provider makes quarterly franchise payments to the municipality in which it provides service.  *See* TEX. UTIL. CODE ANN. §66.005 & 66.010.  More specifically, Chapter 66 states that a cable service provider's quarterly franchise payment must be equal to five percent (5%) of "gross revenues" (as the term is defined in Chapter 66), earned by the franchise holder in that city.  *Id.* at §66.006.  In addition, Chapter 66 provides that the holder of the SICFA shall pay each city an amount equal to one percent (1%) of the provider's "gross revenues" to support PEG access channels (collectively, the payments of five (5%) and one (1%) percent will be known as the "Franchise Fees").  *See* TEX. UTIL. CODE ANN. §66.006.  Finally, Chapter 66 authorizes municipalities to review the business records of the cable service provider to ensure compliance with the payment of Franchise Fees.  *See id.* at §66.005(b).

12.     On January 1, 2006, TWC began operating in San Antonio under SICFA No. 90007, authorized by the PUC pursuant to Chapter 66 of PURA.  TEX. UTIL. CODE ANN. §66.004. Texas law authorizes municipalities to review the business records of the cable service provider to ensure the cable service provider is complying with its payment obligations. *Id.* §66.005(b) and §66.006(b).  The City monitors TWC's compliance of Chapter 66 of the Act through an audit.

13. In 2009, the City exercised its rights under Chapter 66 of the Act by initiating an audit of the Franchise Fees paid by TWC based on TWC's "gross revenues" received from subscribers residing within San Antonio's city limits. The purpose of this audit was to determine if TWC was in compliance with Chapter 66. The audit was intended to cover the period of 2006, the year that TWC began operating under its SICFA authorized by the Texas PUC, through 2009.

14. More specifically, in February 2009, the City requested TWC submit to a routine audit to determine if TWC properly calculated and remitted the Franchise Fees for all subscribers inside the San Antonio city limits. TWC refused to release the data necessary to enable the City to conduct an audit citing privacy statutes amongst other reasons.

15. When TWC objected to the production of documents and information necessary to conduct an accurate and thorough audit, the City filed a Petition for Writ of Mandamus to Compel Production and Examination of TWC's Business Books and Records in state district court in San Antonio on October 5, 2009. On April 18, 2011, following a trial on the merits, the Court issued an Order (the "Order") compelling TWC to produce relevant financial documents listed in the Order within 60 days as set forth in the Order.

16. The City and TWC met in person or talked on various occasions about the City's audit, TWC's calculation of "gross revenues" and TWC's failure to remit all owing Franchise Fees to the City. TWC continued to intentionally avoid producing the documents needed to conduct a complete and accurate audit. More egregiously, TWC would produce incomplete, incorrect, and contradictory documents.

17. TWC failed to fully adhere to the Order, thereby hindering the audit review through 2011-2012. Specifically, TWC failed to make personnel available to answer clarifying questions as required by the Order; did not provide follow-up information; provided contradictory

information; and did not produce certain information listed in the Order. For example, TWC's failure to correctly associate subscriber accounts within the correct city resulted in TWC producing unreliable subscriber transaction billing data and pass-by data to the City.

18. TWC repeatedly assured the City that it would comply with the Order. This repeated assurance convinced the City it was not necessary to bring a lawsuit to compel compliance with the Order and, therefore, complete a final audit. Indeed, TWC continued to profess its compliance with the Order while providing inconsistent and contradictory information to the City between 2011 and 2014. The lack of reliable information provided by TWC made the routine task of completing an audit more arduous and time consuming.

19. In 2014, three years after the Order, the City completed the audit based on TWC's incomplete documentation and disregarding the inaccurate information provided by TWC. The audit revealed that TWC miscalculated and/or underreported, and therefore, underpaid its Franchise Fees.

20. The City determined TWC owes it unpaid Franchise Fees related to five categories, set forth in more detail below: 1) Under-reported Subscriber Revenue; 2) Under-reported Advertising Revenue; 3) Incorrect Calculation Methodology; 4) Under-reported Package Early Termination Fees; and 5) Unreported Third-Party Advertising Fees.

21. Under-reported Subscriber Revenue: TWC did not include all cable subscriber revenue in its calculation of Franchise Fees due to the City. Examples of errors committed by TWC were: 1) addresses assigned to other municipalities (franchises) that should have been assigned to the City and addresses assigned to the City that should have been assigned to other municipalities (franchises); and 2) revenue was in accounts that did not match any addresses reflected in the pass-by data (e.g., a list of addresses that are potentially serviceable). Indeed,

TWC provided data for the first quarter 2006 twice and for the fourth quarter 2008 three times, each with significantly different results. If TWC's pass-by data were reliable, each of the datasets for a given time period would essentially be the same. Because the data is not reliable, the City cannot be assured TWC accurately calculated and remitted Franchise Fees.

22. Under-reported Advertising Revenue: TWC committed a number of errors in its methodology when calculating "gross revenues" for the purpose of remitting the Franchise Fees due to the City. These errors included, but were not limited to: 1) netting commissions against accounting revenue in violation of Section 66.002(6)(A); 2) allocating advertising, home shopping and product launch revenue based on the ratio of "paid" subscribers (basic cable less fees), rather than on the ratio of all subscribers as required by Section 66.002(6)(A); 3) providing insufficient information on national advertising, associated commissions, and the allocation methodology for these revenues; and 4) not using accurate ratios of San Antonio cable subscribers to all TWC cable subscribers in its allocation of non-subscriber revenue (TWC did not account for bulk accounts e.g., apartment complexes that procure cable services for all tenants).

23. Incorrect Calculation Methodology: TWC used two different methods for calculating the Franchise Fees it owed the City during the audit period. TWC excluded certain types of revenue from its calculation of "gross revenues" under both methods. These errors included, but were not limited to, TWC omitting Franchise Fees collected from subscribers in its calculation of gross revenues and failing to subtract the associated bad debt from its calculations of gross revenue. Franchise fees collected from subscribers fall directly under the definition of "gross revenue" in Section 66.002(A-B) of the Texas Utilities Code, as do customer development program adjustments, hotel on demand purchases, VOD adjustments and Refer-A-Friend

Discounts (also known as contra-revenue). As a result of TWC excluding these types of revenue from its calculation of "gross revenue", TWC under-paid its Franchise Fees to the City.

24. Under-reported Package Early Termination Fees: TWC began to report package early termination fees in August 2008. TWC did not report package early termination fees for the period from January 2006 through July 2008.

25. Unreported Third-Party Advertising Fees: Beginning in 2012, TWC separated advertising revenue into two categories: 1) regular advertising; and 2) third-party advertising. TWC omitted third-party advertising fee revenue and the related commissions from its "gross revenue" before calculating the Franchise Fees owed to the City in violation of Section 66.002(6)(A).

26. Following completion of the audit in 2014, the City and TWC met in person or talked on various occasions over the next three years about the City's audit and TWC's objections to the City's calculation of TWC's underpayment of Franchise Fees. The parties even went to mediation in 2016 in an attempt to resolve their differences. The City remained diligent in trying to communicate with TWC and worked earnestly in its negotiations with TWC about the City's audit, TWC's calculation of "gross revenues" and TWC's failure to remit all owing Franchise Fees to the City.

27. Unfortunately, the parties were unable to reach an agreeable resolution. Thus, as a result of TWC's failure to properly account for and remit the Franchise Fees as required by the Act, the City suffered damages, for which the City now sues to recover. More specifically, TWC's improper accounting, incorrect methodology and other errors and omissions resulted in TWC owing the City an amount exceeding the jurisdictional limits of the Court in unpaid Franchise Fees, not including interest from 2006 through the time of filing this lawsuit.

## IV.
## PLAINTIFF'S CAUSES OF ACTION

    **i.**    **Count 1 - Declaratory Judgment**

28.    The City incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth therein.

29.    Following removal to federal court, a claim brought under the Texas Declaratory Judgment Act is construed as one brought under the federal Declaratory Judgment Act, Title 28 U.S.C. §§ 2201-2202. Texas Civil Practice & Remedies Code Section 37.001 *et. seq.* provides a way to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations …." A person "whose rights, status, or other legal relations are affected by a statute … may have determined any question of construction or validity arising under the … statute … and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE §37.004.

30.    Due to the fact that TWC owes the City Franchise Fees there is an actual and present justiciable controversy regarding TWC's legal obligations and responsibilities to the City under the Act. The facts alleged herein show there is a substantial controversy between the City and TWC regarding the classification and calculation of "gross revenue" under the Act.

31.    Pursuant to the Act, TWC must include all: 1) subscriber revenue; 2) advertising revenue; 3) early package termination fees; and 4) third-party advertising revenue in its calculation of "gross revenue." As a result of TWC's failure to correctly calculate the Franchise Fees based on the additional "gross revenue" resulting from the inclusion of the subscriber, advertising, third-party advertising revenues and early package termination fees, the City has not received the total Franchise Fees it is entitled to under the Act.

32. Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, the City seeks a declaration from the Court that for the period of 2006 through the present:

    a. The definition of "gross revenue" found in Chapter 66 of the Act, includes, but is not limited to:

        i. Any amounts of advertising revenue and commissions shown on TWC's books and records;

        ii. Any other amounts of contra-revenue. This includes: Refer-A-Friend Discounts, VOD adjustments, hotel on demand purchases, and restocking fees;

        iii. Any revenue derived from unreturned equipment;

        iv. Any Franchise Fees collected from subscribers and other customers;

        v. Any FCC end-user fees; and

        vi. Any revenue generated from new cable services.

    b. TWC shall provide the following as "support" for quarterly payments as required under Sections 66.005 and 66.006 of the Act.

        i. Electronic download of the General Ledger and revenue account structure with descriptions. The format of such files can be agreed to between TWC and the City, but at a minimum data will be provided in pipe delineated files;

        ii. Reconciliation of basis of payments to the City with the General Ledger accounts in the franchise area and for other revenue accounts;

        iii. Calculations showing the allocation of advertising and revenue that is not recorded to specific franchise areas;

        iv. Monthly subscriber accounts in San Antonio and in other areas served by the San Antonio system, including the number of subscribers in any bulk account; and

        v. Pass-by data for each quarter.

### ii. Count 2 - Statutory Violations

33. The City incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

34. Section 66.005 of the Texas Utilities Code requires TWC to pay the City a franchise fee of five percent based upon gross revenue as defined in Chapter 66. Section 66.005(b) further states that "[a] municipality may, in the event of a dispute concerning compensation under this section, bring an action in a court of competent jurisdiction.

35. Section 66.006 of the Texas Utilities Code requires TWC to pay the City a PEG fee of one percent of TWC's gross revenue as defined in Chapter 66. Section 66.006 further states that payments are to be paid in the same manner outlined in Section 66.005(b).

36. TWC has not properly calculated the Franchise Fees owed to the City. TWC under-reported and omitted revenue. TWC also used an incorrect methodology to calculate revenue and the Franchise Fees owed to the City. These actions are in violation of Sections 66.005 and 66.006 of the Texas Utilities Code. As a result of these violations, TWC should be required to properly calculate its gross revenue and remit all amounts owed to the City.

### iii. Count 3 - Money Had and Received

37. The City incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

38. As a result of TWC's unlawful conduct, TWC holds money that in equity and good conscience belongs to the City. More specifically, TWC has not paid the City the full amount of Franchise Fees owing pursuant to the Act. The City has been damaged by TWC's conduct. TWC should be ordered to account for and immediately remit these funds to the City.

  **iv.**  **Count 4 - Attorney Fees**

39. The City incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

40. The City is entitled to its costs and reasonable and necessary attorney's fees pursuant to Texas Civil Practice & Remedies Code Section 37.009.  Accordingly, the City seeks to recover all of its court costs and attorneys' fees associated with prosecuting its claims, both at the trial court level and on any appeal.

## V.
## DAMAGES AND REMEDIES

41. The City incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

42. A declaratory judgment that definition of "gross revenue" found in Chapter 66 of the Act, includes, but is not limited to: a) any amounts of advertising revenue and commissions shown on TWC's books and records; b) any other amounts of contra-revenue including, but not limited to, Refer-A-Friend Discounts, VOD adjustments, hotel on demand purchases, and restocking fees; c) any revenue derived from unreturned equipment; d) any Franchise Fees collected from subscribers and other customers; e) any FCC end-user fees; and f) any revenue generated from new cable services.

43. A declaration that TWC has an ongoing obligation to remit all Franchise Fees as required by Chapter 66 of the Texas Public Utilities Regulatory Act.

44. All of its general, actual, special, and consequential damages, as may be determined by the finder of fact;

45. Costs of court;

46. Attorneys' fees as provided by law; and

47. Pre- and post-judgment interest as allowed by law.

## VI.
## TRIAL BY JURY

48. In accordance with Fed. R. Civ. P. 38, Plaintiff, City of San Antonio, respectfully requests trial by jury.

## VII.
## PRAYER

49. WHEREFORE, PREMISES CONSIDERED, the City asks this Court to set this matter for hearing and, upon final hearing award the City actual damages, exemplary damages, costs, and such other and further relief to which it is justly entitled (including prejudgment and post-judgment interest at the maximum legal rate and as provided by law) at law and/or equity. Further, the City seeks all available penalties pursuant to Section 66.015 of the Texas Utilities Code. The City also demands judgment for all other relief to which it deems itself entitled.

> Respectfully Submitted,
>
> CITY OF SAN ANTONIO
> Office of the City Attorney
> Litigation Division
> Frost Bank Tower
> 100 W. Houston St., 18th Floor
> San Antonio, Texas  78205
>
> _____
> Richard Riley
> Assistant City Attorney
> Bar No: 24033121
> (210) 207-8918/ (210) 207-4357 Fax
> Richard.Riley@sanantonio.gov
> Michael Urbis
> Assistant City Attorney
> Bar No: 20414130
> (210) 207-8975/ (210) 207-4357 Fax
> Michael.Urbis@sanantonio.gov
> *ATTORNEYS FOR PLAINTIFF, CITY OF SAN ANTONIO*

## **CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system that will send notification of such filing to the following on July 20, 2018:

John T. Cox III
Britta Erin Stanton
LYNN PINKER COX & HURST, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Tel. 214-981-3800
Fax 214-981-3839

Paul A. Werner*
Abraham J. Shanedling*
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. 202-747-1931
Fax 202-747-3817

*Admitted *pro hac vice*

Attorneys for Time Warner Cable Texas, LLC
d/b/a Spectrum and Charter Communications

                                                                                                                     RICHARD RILEY