**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

**CITY OF SAN ANTONIO,**

*Plaintiff*,

**v.**                                                                    **Case No. SA-17-CV-1232-JKP-HJB**

**TIME WARNER CABLE, TEXAS
LLC, d/b/a Spectrum and Charter
Communications,**

*Defendant*.

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case involves an audit by the City of San Antonio ("Plaintiff" or "the City") of Defendant Time Warner Cable Texas LLC's ("TWC") franchise fee payments and the City's efforts to obtain information to complete its audit and to obtain damages for underpayments. Before the Court are cross motions for summary judgment: *TWC's Motion for Summary Judgment* (ECF No. 73) and *City of San Antonio's Motion for Partial Summary Judgment* (ECF No. 76). The motions are fully briefed, including evidence submitted by both sides.[1] TWC has filed a response (ECF No. 88) to the City's summary judgment motion and a reply brief (ECF No. 104 with an exhibit) supporting its motion. The City has similarly filed a response (ECF No. 91 with exhibits) to Defendant's motion and a reply brief (ECF No. 102) to support its motion. The Court has also received an amicus brief from the Texas Attorney General (ECF No. 101), an amicus brief from a Coalition of Cities (ECF No. 116), and TWC's response (ECF No. 117) to the latter brief. After considering the motions, related briefing, relevant evidence, and the applicable law the Court grants both

---

[1] TWC has filed forty exhibits, some under seal, ECF Nos. 73-1 through 73-40, with its motion for summary judgment. The City has supported its motion with sealed exhibits, (ECF Nos. 76-1 through 76-24). Although the parties have submitted sealed exhibits, the Court finds no reason to seal this Memorandum Opinion and Order.

motions in part as set forth herein.

## I. BACKGROUND[2]

In 2005, Texas enacted Chapter 66 of the Public Utility Regulatory Act ("PURA"), Tex. Util. Code §§ 66.001 to 66.017.[3] Chapter 66 became effective in September 2005. This case concerns an alleged underpayment of cable franchise fees. In 2009, the City began an audit of TWC's franchise fees for the period 2006 to 2009. In September 2009, after TWC had objected to the production of documents and information necessary to conduct the audit, the City commenced a state mandamus action to compel production and examination of TWC's business books and records. *See ECF No. 91-1 (Ex. H, Pl.'s Pet. Mandamus)*. In April 2011, the City succeeded in that action after a trial on the merits. *See ECF No. 91-2 (Ex. I, Order)*.

The parties have diverging views as to what happened during the intervening years. Defendant paints a picture of ineptness, abandonment, and neglect on the part of the City, whereas the City paints TWC as hindering and obstructing the audit process. But despite the differing characterizations, the parties essentially agree on the facts. The parties disagree on TWC's compliance with disclosure obligations during the intervening years, but they agree that they discussed the issues on various occasions through 2011 and 2012. The City completed a draft audit in 2014 based upon what it viewed as incomplete documentation. *See ECF No. 76-11 (sealed Ex. K)*. The Executive Summary of that draft audit shows an underpayment of fees by TWC between 2006 and 2015. *See id*. at i. Following that audit, the parties continued to meet on several occasions. On August 17, 2015, the City sent TWC a demand letter for underpayments from 2006 through 2013. *See ECF No. 91-20 (Ex. J-19)*. The City voluntarily dismissed the mandamus action without

---

[2] Except where noted, the background facts are undisputed.

[3] The parties often refer to Chapter 66 and its various provisions as PURA. Even though the Act itself is much broader than Chapter 66, the Court may also use PURA in the same shorthand manner.

prejudice on March 22, 2016. *See ECF No. 91-21 (Ex. N, Order of Dismissal)*. Later that year, the parties unsuccessfully mediated their dispute. *See ECF No. 91-24 (sealed Ex. A)*.

Plaintiff commenced this action in state court in October 2017. *See Pl.'s Orig. Pet.* (ECF No. 1-1). Defendant removed the action to this Court on December 4, 2017, based on diversity jurisdiction. *See Notice of Removal* (ECF No. 1). In April 2018, the Court denied Defendant's motion to dismiss as to Plaintiff's request for declaratory relief and Defendant's assertions of laches and waiver but granted it with respect to asserted claims of accounting and constructive trust. *See Order* (ECF No. 14). Plaintiff omitted the dismissed claims in its First Amended Complaint ("FAC") filed in July 2018. *See FAC* (ECF No. 23). It therein seeks a declaratory judgment as to (1) the definition of "gross revenue" as found in PURA and (2) "support" required under PURA. *See id.* ¶ 32. It also asserts claims for statutory violations, money had and received, and attorney fees. *See id.* ¶¶ 33-40. It seeks unpaid franchise fees "from 2006 through the time of filing this lawsuit." *Id.* ¶ 27.

On April 17, 2020, Plaintiff filed an opposed motion for leave to file a Second Amended Complaint ("SAC") that proposes amendments to "(1) clarify Plaintiff's position; (2) narrow the issues before this Court; and, (3) do not add any factual allegations, causes of action, or requested relief." *See ECF No. 71* at 2. Later that day, the parties filed their cross motions for summary judgment. Defendant argues that Plaintiff's claims not only fail on their merits but are also barred by the doctrines of laches and waiver. Plaintiff, on the other hand, moves for partial summary judgment on its claim for declaratory judgment and sets out three requested declarations.

The parties have completed their briefing on the motions and interested parties have filed amicus briefs. The Court is prepared to rule. Given the cross nature of the motions, the briefing often overlaps and duplicates other briefing. In general, the Court may merely cite to one source

of duplicative information.

## II. APPLICABLE LAW

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *accord Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Because jurisdiction in this case is based on diversity of citizenship, the Court must "apply Texas law." *Ocwen Loan Servicing, L.L.C. v. Berry*, 852 F.3d 469, 473 (5th Cir. 2017).

"When reviewing issues of state law, federal courts look to the law of that state's highest court." *City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014); *accord Price v. City of San Antonio, Tex.*, 431 F.3d 890, 892 (5th Cir. 2005). Absent a final decision by the Texas Supreme Court that "'precisely' resolves the legal issue, federal courts "must make an *Erie* guess and determine as best [they] can what the Supreme Court of Texas would decide." *Martinez v. Walgreen Co.*, 935 F.3d 396, 398 (5th Cir. 2019) (citation omitted). When compelled to make an *Erie* guess, federal courts "defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008) (citations and internal quotation marks omitted); *accord Price*, 431 F.3d at 893 n.5. The federal courts not only look to the intermediate state appellate decisions, but also to "the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Martinez*, 935 F.3d at 398 (citation omitted).

When federal courts "interpret a Texas statute," they "follow the same rules of construction that a Texas court would apply—and under Texas law the starting point of [the] analysis is the plain language of the statute." *Forte v. Wal-Mart Stores, Inc.*, 780 F.3d 272, 277 (5th Cir. 2015)

(quoting *Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007)), *certified question accepted* (Mar. 6, 2015), *certified question answered*, 497 S.W.3d 460 (Tex. 2016).

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When seeking summary judgment on an affirmative defense, the movant "must establish beyond peradventure" each essential element of the defense. *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986).

When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Once the

movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

## IV. LACHES

TWC asserts that Plaintiff's claims are barred by laches. *ECF No. 73* at 22-29. The Court addressed this defense in the context of TWC's motion to dismiss. *See City of San Antonio v. Time Warner Cable Texas, LLC*, No. SA-17-CV-01232-OLG, 2018 WL 6588564, at *3 (W.D. Tex. Apr. 9, 2018). As previously recognized, "municipalities are generally exempt from statute of limitations defenses." *Id.* (relying on Tex. Civ. Prac. & Rem. Code § 16.061(a)). But laches differs from such statutory defenses and may be asserted against a municipality that "unreasonably delays asserting its rights." *Houston Lighting & Power Co. v. City of Wharton*, 101 S.W.3d 633, 639 (Tex. App. – Houston [1st Dist.] 2003, pet. denied). And the defense may apply despite a general prohibition to applying laches to cities when they perform a governmental function. *Id*. This is so, because "Texas courts have repeatedly held that, although equitable defenses do not generally apply to governmental entities when they are acting in their governmental capacity, equitable defenses may apply when justice requires it and no governmental function is impaired." *Id.* (citing *Roberts v. Haltom City*, 543 S.W.2d 75, 80 (Tex. 1976); *City of Dallas v. GTE Sw., Inc.*, 980 S.W.2d 928, 937 (Tex. App. – Fort Worth 1998, pet. denied); *City of Corpus Christi v. Nueces Cty. Water*

6

*Control & Improvement Dist. No. 3*, 540 S.W.2d 357, 378-79 (Tex. Civ. App. – Corpus Christi 1976, writ ref'd n.r.e.)).

The laches defense "is akin to that of estoppel." *City of El Paso v. El Paso Entm't, Inc.*, 382 F. App'x 361, 366 (5th Cir. 2010) (per curiam) (quoting *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964)). And Texas "has 'long held that a city cannot be estopped from exercising its governmental functions.'" *Id.* (quoting *City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 773 (Tex. 2006)). While Texas courts apply a "narrow" when-justice-requires exception, they apply estoppel "with caution and only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice." *Id.* (quoting *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 836 (Tex. 1970)). The Texas Supreme Court has clarified "that the exception is limited to instances where 'city officials may have affirmatively misled the parties seeking to estop the city and . . . the misleading statements resulted in the permanent loss of their claims against the cities." *Id.* (quoting *Super Wash*, 198 S.W.3d at 775). Thus, courts may allow the laches defense only when "justice requires estoppel and the party asserting the defense would otherwise be without a remedy." *Id.*

Although "Texas courts have recognized that certain affirmative defenses do not apply if a city is exercising a governmental, as opposed to a proprietary, function," the "threshold question" is what function is at issue. *Truong v. City of Houston*, 99 S.W.3d 204, 209 (Tex. App. – Houston [1st Dist.] 2002, no pet.). "The distinction has not been a clear one, but generally speaking, a municipality's proprietary functions are those conducted in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government, while its governmental functions are in the performance of purely governmental matters solely for the public benefit." *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006) (citations, footnotes, and internal

quotation marks omitted); *accord* Tex. Civ. Prac. & Rem. Code § 101.0215(a) (providing a non-exhaustive list of governmental functions and defining such functions as "those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public") and (b) (providing non-exhaustive list of proprietary functions and defining such functions as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality"). "The key difference between" the two types of functions "is that the city functions in its governmental capacity when it performs functions mandated by the state." *Truong*, 99 S.W.3d at 210.

Here, the parties disagree whether the City is exercising a governmental or proprietary function. *Compare ECF No. 91* at 8 *with ECF No. 104* at 2-3. And their disagreement affects their description of the City's action – Plaintiff describes it as collecting franchise fees from Defendant, whereas Defendant describes it as conducting an audit. While both sides present arguable positions, the City seems to have the better position. Defendant, moreover, has the burden to show that its defense applies. And that means that Defendant must show circumstances sufficient to justify application of the defense as well as establishing each essential element of the defense.

By enacting PURA, Texas established a framework for the regulation of state-issued cable and video franchises, including the collection of franchise fees. *See* Tex. Util. Code §§ 66.001 to 66.017. Texas sets the amount of fees, defines how to calculate the fees, provides enforcement mechanisms, and mandates that franchises pay fees to the municipalities. *Id.* § 66.005. Compared to the functions listed in Tex. Civ. Prac. & Rem. Code § 101.0215 the function most closely resembles tax collection, which is a governmental function.

Defendant characterizes the City's efforts to obtain franchise fees as "a quintessentially proprietary activity because it is for the benefit of the City's residents and is discretionary." *ECF*

*No. 104* at 2. It points to a discretionary aspect of § 66.005(b) that provides municipalities with the authority to review business records. *See id.* But that discretionary aspect is expressly limited "to the extent necessary to ensure compensation in accordance with" the franchisee's obligation to pay franchise fees under § 66.005(a). Section (b) also provides discretionary authority for cities to commence litigation regarding a compensation dispute.

Defendant's contention that the City is acting only for the benefit of its residents appears at odds with its motion's introductory paragraph in which it characterizes the City's action as "a baseless effort to extort additional fees from TWC that ultimately would come from its subscribers who are City taxpayers." *ECF No. 93* at 1. Further, Defendant does not identify what benefit accrues to the City's residents rather than the public in general. As shown by the amicus briefs, other municipalities could benefit should Plaintiff succeed with this action, which requires interpretation of a state statute. As a state requirement to pay franchise fees, the public in general would reap benefits from this litigation.

Further, at its essence, this is a case about an alleged underpayment of franchise fees by Defendant. Collecting those fees is a governmental function imposed by Texas statute. The statute requires franchises to pay fees to the municipalities. There is no provision to permit private persons to collect the fees. And, while the statute provides that municipalities may bring a court action for any compensation dispute, it does not permit a private person to do so. Furthermore, while the statute provides discretionary authority to review business records, i.e., conduct an audit, such function is intricately intertwined with the state mandate that franchises pay the franchise fee. Even if a municipality may secure private assistance with conducting an audit, that does not alter the ultimate governmental function – collecting franchise fees – that led to this litigation. The Fifth Circuit commented long ago that it does "not think that a five percent franchise fee for a service

rendered to the citizens by a private company places the government in a proprietary capacity even if the government were acting as administrator of the franchise." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1085 (5th Cir. 1988). Collecting such a five percent fee is not a proprietary function even if the municipality exercises its discretionary authority to conduct an audit and even if it utilizes a private expert to complete or assist with the audit.

For these reasons, the Court finds that Defendant has not carried its burden to show that Plaintiff is merely exercising a proprietary function. The Court thus proceeds as though Plaintiff is exercising a governmental function. Therefore, for the laches defense to be applicable here, Defendant must show that this is an exceptional case that does not impair any governmental function and clearly demands application of laches to prevent manifest injustice. And, as clarified by the Texas Supreme Court, that means that Defendant must show that city officials may have affirmatively misled it and the misleading statements resulted in the permanent loss of its claims against the City. Defendant points the Court to no such evidence. Defendant, furthermore, has no claims against the City. It is the City that is trying to collect fees. Accordingly, the circumstances of this case, as presented on summary judgment, do not clearly demand application of the defense to prevent manifest injustice.

Furthermore, whether the defense applies under the narrow exception also depends on Defendant making a sufficient showing of the elements of its defense. "Under Texas law the two elements of laches are '(1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of the delay.'" *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1082 (5th Cir. 1997) (quoting *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989)). These are required elements even if Defendant had shown that Plaintiff was exercising a proprietary, rather than governmental, function. And

while Defendant makes broad accusations about unreasonable delay and its detrimental reliance, there is at least a genuine dispute of material fact as to whether Plaintiff unreasonably delayed asserting its rights under Chapter 66. Such factual dispute precludes summary judgment based on this defense and eliminates any need to consider whether Defendant made a good faith change of position to its detriment.

The factual dispute as to unreasonable delay also goes to the extent of Plaintiff's claims for damages, which expand from 2006 through October 2017 (date of original state petition) or July 2018 (date of FAC). What may constitute an unreasonable delay for damage claims from 2006 may not constitute delay at all for damage claims from 2017. Furthermore, even if there is the potential applicability of laches for collecting fees that were due as far back as 2006, Defendant has shown no potential applicability for Plaintiff's claim for declaratory relief seeking the interpretation of a state statute that has not changed in any pertinent respect in the intervening years. The doctrine of laches simply appears to be ill-suited as a defense to the declaratory judgment claim asserted in this case.

For these reasons, the Court denies TWC's motion to the extent it relies on the doctrine of laches.

## V. WAIVER

TWC also asserts that Plaintiff's claims are barred by the doctrine of waiver. *ECF No. 73* at 29-31. As it did with laches, the Court addressed this defense in the context of TWC's motion to dismiss. *See City of San Antonio v. Time Warner Cable Texas, LLC*, No. SA-17-CV-01232-OLG, 2018 WL 6588564, at *4 (W.D. Tex. Apr. 9, 2018). As previously recognized:

> Under Texas law, waiver "is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). "Silence or inaction, for so long a period as to show an intention to yield a known right, is [ ] enough to

prove waiver." *Bott v. J.F. Shea Co.*, 388 F.3d 530, 533 (5th Cir. 2004) (quoting *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996)). However, "the issue of waiver becomes a matter of law only where material facts and circumstances are undisputed or clearly established and there is no room for argument or inference." *First Interstate Bank of Ariz., N.A. v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir. 1991). . . .

2018 WL 6588564, at *4.

"The elements of waiver are: (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence; and (3) actual intent to relinquish the right, which can be inferred from conduct." *First Interstate Bank*, 924 F.2d at 595. In general, "waiver is a fact question turning on the question of intent." *Id.* "Waiver requires either actual intent to relinquish a right *or* intentional conduct inconsistent with claiming the right – not both." *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 792 (Tex. App. – Houston [14th Dist.] 2016, no pet.). TWC has the burden to "conclusively establish waiver." *Sefzik v. City of McKinney*, 198 S.W.3d 884, 895 (Tex. App. – Dallas 2006, no pet.).

Considering the summary judgment evidence in a light most favorable to Plaintiff, the Court cannot find that Defendant has carried its burden to establish waiver. Accordingly, it denies TWC's motion to the extent it is based on the doctrine of waiver.

## VI. DECLARATORY JUDGMENT AND STATUTORY VIOLATIONS

Contending that Plaintiff's declaratory judgment and statutory violations lack merit, Defendant moves for summary judgment on the claims together. *ECF No. 73* at 31-44. In response, Plaintiff notes that it has moved for summary judgment on its declaratory judgment claim but not on its claim based on statutory violations. *See ECF No. 91* at 20. It contends that, while "the claims are topically related, the claims vary in that the declaratory judgment claim only involves questions of law regarding the proper construction of PURA while the statutory violation claim involves complicated questions of fact regarding TWC's accounting and billing practices." *See id.*

In its First Amended Complaint, Plaintiff seeks a declaration that the definition of "gross revenue" as found in PURA includes but is not limited to six enumerated categories identified as:

(i) Any amounts of advertising revenue and commissions shown on TWC's books and records;

(ii) Any other amounts of contra-revenue. This includes: Refer-A-Friend Discounts, VOD adjustments, hotel on demand purchases, and restocking fees;

(iii) Any revenue derived from unreturned equipment;

(iv) Any Franchise Fees collected from subscribers and other customers;

(v) Any FCC end-user fees; and

(vi) Any revenue generated from new cable services.

*See FAC* ¶ 32(a). It also seeks a declaration that TWC must provide the following as "support" for quarterly payments as required by PURA:

(i) Electronic download of the General Ledger and revenue account structure with descriptions. The format of such files can be agreed to between TWC and the City, but at a minimum data will be provided in pipe delineated files;

(ii) Reconciliation of basis of payments to the City with the General Ledger accounts in the franchise area and for other revenue accounts;

(iii) Calculations showing the allocation of advertising and revenue that is not recorded to specific franchise areas;

(iv) Monthly subscriber accounts in San Antonio and in other areas served by the San Antonio system, including the number of subscribers in any bulk account; and

(v) Pass-by data for each quarter.

*See id*. ¶ 32(b). The City's statutory violations are limited to alleged failures of Defendant to pay the five percent franchise fee of § 66.005 and a one percent fee of § 66.006, which are both calculated from gross revenues. *See id*. ¶¶ 34-36.

## A. Dropped Claims and Impact of Proposed Second Amended Complaint

Plaintiff has filed an opposed motion for leave to file a Second Amended Complaint. The Magistrate Judge is holding the motion and a related motion for sanctions pending ruling on the

two motions for summary judgment now before the Court. In response to TWC's motion, the City often relies on the proposed amendment. In fact, it states: "The Proposed Second Amended Complaint only amends the City's Complaint to the extent it: (1) drops claims the City decided not to pursue following final depositions; (2) makes minor, non-substantive clarifications to factual allegations following the completion of discovery; and (3) clarifies the City's specific request for declaratory judgment." *ECF No. 91* at 31 n.16.

Within that response, Plaintiff also affirmatively states that (1) it "does not seek to collect fees on any revenue involving a thirty party . . . unless such revenue is specifically addressed by PURA," (2) the only involvement with third parties involve advertising, and (3) it has "dropped an additional issue involving third parties and advertising when it determined that such third party revenue should not be subject to franchise fees under PURA." *See id.* at 27 n.13. Plaintiff also limits its claim regarding unreturned equipment to franchise fee payments made by TWC prior to 2016, because TWC has conceded that it began including revenue from unreturned equipment since 2016. *See id.* at 28 n.14.

The proposed Second Amended Complaint drops the request for declaratory judgment regarding categories (ii), (v), and (vi) related to "gross revenue." *See Proposed SAC* ¶ 30(a). It also changes category (iv) of the required "support" by including free and nonpaid accounts with bulk accounts. *See id.* ¶ 30(b)(iv). Through the proposed SAC, Plaintiff also alters ¶ 20 to allege that TWC owes unpaid franchise fees related to three (rather than five)[4] categories: (1) under-reported subscriber revenue, (2) under-reported advertising revenue, and (3) incorrect calculation methodology. *See id.* ¶ 20. The SAC alters ¶ 21 relating to under-reported subscriber revenue by deleting

---

[4] The FAC had included two other categories: (4) under-reported package early termination fees and (5) unreported third-party advertising fees. *See ECF No.* 23 ¶¶ 20, 23-24. The SAC drops those categories as a basis for unpaid franchise fees.

the last sentence: "Because the data is not reliable, the City cannot be assured TWC accurately calculated and remitted Franchise Fees." *Compare id.* ¶ 21 *with FAC* ¶ 21.

Whether or not the Court grants the proposed amendment, Plaintiff may drop or abandon claims and, through the SAC and its briefing on the cross motions for summary judgment, Plaintiff abandons its request for certain declarations noted above as well as two categories that formed its basis for alleging unpaid franchise fees. Defendant itself concedes in its reply brief that the City has dropped its claims regarding early termination fees, third party advertising fees, revenue from unreturned equipment since 2016, and FCC end-user fees. *See ECF No. 104* at 5. Thus, its arguments on these claims no longer warrant consideration. *See ECF No. 73* at 41-42 (early termination fees); 42-43 (third-party advertising fees); 43-44 (FCC end-user fees). And, in response to the motion to amend, it recognizes Plaintiff's attempt to drop those claims in addition to seeking to drop the sentence from ¶ 21. *ECF No. 79* at 6 (comparing SAC ¶ 21 with FAC ¶ 21).

Through its motion, the City seeks summary judgment on its declaratory judgment claim and thus initially requests declarations "that: (1) TWC may not subtract advertising commissions from revenue for purposes of franchise fee payments made to the City under Chapter 66; and (2) any revenue derived from unreturned equipment fees must be included as revenue for purposes of franchise fee payments made under Chapter 66." *ECF No. 76* at 2. In concluding its motion, it reiterates those requested declarations and requests a third declaration that "Generally Accepted Accounting Principles [("GAAP")] do not supersede the express provisions regarding calculations of gross revenue in Chapter 66 of PURA nor do they justify the omission of any realized revenue from unreturned equipment fees for purposes of calculations made pursuant to Chapter 66."[5]

---

[5] While GAAP represents accounting principles, the acronym appears singular. Thus, courts and parties often treat it as singular in many instances. The Court may treat it as singular or plural depending on the circumstances.

categories *Id.* at 18. In response to Defendant's motion, the City states that its

> declaratory judgment claim seeks a declaration that (1) GAAP does not supersede
> the language of PURA; (2) advertising commissions (as that phrase is used on
> TWC's internal accounting records and advertising invoices) shall not be netted
> against gross revenue even if TWC did not actually receive such revenue; and (3)
> unreturned equipment fees must be included in gross revenue when realized.

*ECF No. 91* at 20. And, in conclusion to that response, it asks the Court to deny TWC's motion,

grant its motion, and make the three declarations set out in its motion. *Id.* at 37.

For purposes of resolving the cross motions for summary judgment, the Court finds that

Plaintiff has dropped or abandoned certain claims through its proposed SAC and its briefing on

the cross motions. The Court finds no current need to address their merits for purposes of summary

judgment. At this stage of the litigation, it is appropriate to dismiss the dropped and abandoned

claims with prejudice. When considering the pending motion for sanctions, the extent to which the

Magistrate Judge considers these dismissed claims remains within his sound discretion.

Although Plaintiff's motion for summary judgment does not address each component of

the request for declaratory judgment in its First or Second Amended Complaints, the Court does

not consider the motion as dropping any component of the declaratory judgment request other than

the omissions and changes set out in the SAC. Because Plaintiff only pursues partial summary

judgment it is natural for its motion to be more limited than the request for declaratory judgment

within its pleading.

Now that the Court has clarified the remaining claims and those at issue in Plaintiff's mo-

tion, it is prepared to address the merits of both motions for summary judgment. To aid in that

endeavor, it sets out the applicable statutory framework and considers how generally accepted

accounting principles apply with respect to the statute in the context of this case.

**B. Statutory Framework**

The parties agree that the merits of this case require interpretation of Tex. Util. Code §

66.002(6). Indeed, the case involves issues of first impression regarding the interpretation of the Texas statute. In all cases requiring statutory interpretation, courts begin "with the statutory text," and absent a definition within the statute, they generally interpret statutory terms "in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quoting *BP Am. Production Co. v. Burton*, 549 U.S. 84, 91 (2006)).

Both sides argue that the plain meaning of the statute dictates an outcome in their favor. The amicus briefing likewise argue that the plain meaning of the statute dictates a particular outcome. Unsurprisingly, the parties disagree as to what the plain meaning is. The disagreement stems from the meaning of "gross revenues" as used and defined in Chapter 66.

For purposes of Chapter 66, PURA defines several terms in Tex. Util. Code § 66.002. At issue in this case is the lengthy definition of "Gross revenues" set out in § 66.002(6)(A) in conjunction with the exclusions from that definition set out in Paragraph (B). To reduce the definition to its essentials as applied in this case, it is helpful to avoid some of the wordiness by using undisputed facts in this case. First, it is undisputed that TWC is a holder of a state-issued certificate of franchise authority. It is further undisputed that TWC has provided cable and other communication services to the City's residents and businesses. This case, furthermore, presents no reason to differentiate between TWC and any affiliate. Thus, the Court can disregard references to affiliates. Because there is no dispute as to these matters, the Court can peel away some redundancy from the definition by using "TWC" for the entity and its affiliates and "service" or "its services" for covered cable or video services.

With those clarifying tweaks, gross revenues "means all consideration of any kind or nature . . . derived by [TWC] from the operation of [its service] network to provide [its services] within the municipality." *See* Tex. Util. Code § 66.002(6)(A). After that broad definition, the statute

17

clarifies that "[g]ross revenue shall include all consideration paid to [TWC]," including but not limited to (i) "all fees charged to subscribers for any and all . . . service provided by [TWC]," (ii) "any fee imposed on [TWC] by this chapter that is passed through and paid by subscribers," and (iii) compensation received by TWC "that is derived from the operation of [TWC's] network to provide . . . service with respect to commissions that are paid to [TWC] as compensation for promotion or exhibition of any products or services on [TWC's] network, such as 'home shopping' or a similar channel, subject to Paragraph B(v)." *See id.*

Further, "[g]ross revenue includes a pro rata portion of all revenue derived by [TWC] pursuant to compensation arrangements for advertising derived from the operation of [TWC's] network to provide . . . service within a municipality, subject to Paragraph (B)(iii)." *Id.* After the statute explains how to calculate that pro rata allocation of advertising revenue, it states that "[a]dvertising commissions paid to third parties shall not be netted against advertising revenue included in gross revenue." *See id.*

While Paragraph (A) of § 66.002(6) sets out what is included in the definition "gross revenues," Paragraph (B) expressly excludes some revenue or potential revenue from that definition. *See id.* § 66.002(6). Section 66.002(6)(B) contains twelve specific categories that the statute excludes from "gross revenues." Identified by their statutory listing numeral, Defendant identifies the following exclusions as at issue in this case:

> (i) any revenue not actually received, even if billed, such as bad debt;
>
> (iii) refunds, rebates, or discounts made to subscribers, leased access providers, advertisers, or a municipality;
>
> (vii) the provision of cable services or video services to customers at no charge, as required or allowed by this chapter, including without limitation the provision of cable services or video services to public institutions, as required or permitted in this chapter, including without limitation public schools or governmental entities, as required or permitted in this chapter; and

(x) sales of capital assets or sales of surplus equipment that is not used by the purchaser to receive cable services or video services from [TWC].

*ECF No. 73* at 6.[6]

Through § 66.005(a), Texas requires TWC to pay the City "a franchise fee of five percent based upon the definition of gross revenues as set forth in [Chapter 66 – State Issued Cable and Video Franchise]." Through § 66.005(b), Texas requires providers, such as TWC, to (1) pay the required franchise fee "quarterly, within 45 days after the end of the quarter for the preceding calendar quarter" and (2) support its payment by an accompanying "summary explaining the basis for the calculation of the fee." Through that same provision, Texas also provides municipalities, such as Plaintiff, discretionary authority to "review the business records" of providers such as TWC "to the extent necessary to ensure compensation in accordance with [§ 66.005(a)]," but restricts such review to "records that relate to the 48-month period preceding the date of the last franchise fee payment." Section 66.005(b) further allocates the "costs of the examination" to each party while, "in the event of a dispute concerning compensation" under § 66.005, also providing municipalities discretionary authority to "bring an action in a court of competent jurisdiction."

Section 66.005(c) also has some relevancy to this action. It provides that TWC "may recover from [its] customers any fee imposed by [Chapter 66]."

## C. Generally Accepted Accounting Principles

Generally accepted accounting principles, or GAAP, comprise "[a] set of rules that encompass the details, complexities, and legalities of business accounting." *In re Houtex Builders, LLC*, No. 18-34658, 2020 WL 7481743, at *2 n.7 (Bankr. S.D. Tex. Dec. 18, 2020). Further, "[t]he Financial Accounting Standards Board (FASB) uses GAAP as the foundation for its comprehensive set of approved accounting methods and practices." *Id.* The Supreme Court has recognized

---

[6] Defendant also identified exclusion (viii) as at issue, but that exclusion relates to an issue dropped by Plaintiff.

that GAAP "is synonymous with" the phrase "best accounting practice." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 532 (1979).

The parties disagree as to the applicability of GAAP in the context of determining gross revenues under PURA. "Applying GAAP often involves subjective determinations." *Owens v. Jastrow*, 789 F.3d 529, 543 (5th Cir. 2015). And the following passage from *Thor Power* in the tax context appears particularly enlightening:

> Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management. Such, indeed, is precisely the case here. Variances of this sort may be tolerable in financial reporting, but they are questionable in a tax system designed to ensure as far as possible that similarly situated taxpayers pay the same tax. If management's election among "acceptable" options were dispositive for tax purposes, a firm, indeed, could decide unilaterally—within limits dictated only by its accountants—the tax it wished to pay. Such unilateral decisions would not just make the [Internal Revenue] Code inequitable; they would make it unenforceable.

439 U.S. at 544 (footnotes omitted).

Nothing in § 66.002(6) mentions GAAP. But Texas has expressly required application of GAAP in other provisions of PURA. *See* Tex. Util Code §§ 36.065(a) and (b)(1) (addressing pension and other postemployment benefits) and 39.260 (requiring use of GAAP for some terms used in Subchapters F and G of Chapter 39 of PURA). "A statute's silence can be significant." *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004). "When the Legislature has employed a term in one section of a statute and excluded it in another, [courts] presume that the Legislature had a reason for excluding it." *Fireman's Fund Cty. Mut. Ins. Co. v. Hidi*, 13 S.W.3d 767, 769 (Tex. 2000) (per curiam). But at every stage of statutory interpretation, the Court's goal is "to give effect to the Legislature's intent." *Id*. at 768. And courts first look "to the plain meaning of the statute's words." *Id*. at 768-69. Courts also recognize that "legislatures do not always mean to say something by silence." *PPG Indus.*, 146 S.W.3d at 84. In some

instances, "Legislative silence may be due to mistake, oversight, lack of consensus, implied delegation to courts or agencies, or an intent to avoid unnecessary repetition." *Id*. Importantly, however, courts must begin the "analysis by noting that the Legislature clearly knew how to" include specific language regarding GAAP but did not do so in Chapter 66 of PURA. *See id*.

And so that is where this Court begins. Texas certainly knew how to require application of GAAP, but the express terms of § 66.002(6) omits any reference to such accounting principles. The City interprets that to mean that the principles are immaterial to determining gross revenue under the statute. It does not challenge TWC's need to comply with GAAP to "maintain GAAP-compliant accounting for financial reporting purposes" but recognizes that "certain situations like tax accounting require separate books and accounting methods." *ECF No. 102* at 6-7. Defendant, on the other hand, interprets the silence as not dictating anything. And it submits that no one is arguing that GAAP supersede the plain and express language of Chapter 66. *ECF No. 88* at 22.

So, a pertinent question is whether § 66.0002(6) omits reference to GAAP because the Legislature wanted to make the principles irrelevant , because it wanted to permit cable and video providers flexibility in their gross revenue calculations, or for some other reason? The second possibility seems unlikely. And the language of § 66.005(a) expressly states that such providers "shall pay . . . a franchise fee of five percent based upon the definition of gross revenues as set forth in this chapter." That means five percent of gross revenues as defined in § 66.002(6). The definition of gross revenues does not change due to subjective determinations of cable or video service providers. Because the statutory definition of gross revenues controls, GAAP is irrelevant to the extent the principles are not consistent with the statute. Thus, GAAP do not supersede the statutory language and the Court grants the City's motion to the extent it seeks such a declaration through summary judgment.

However, the Court disagrees with the City's assessment that "equating compliance with GAAP to compliance with PURA" effectively argues that GAAP supersedes Chapter 66. *See ECF No. 102* at 6. The statute neither makes the application of GAAP mandatory nor suggests the applicability of such principles. But, if a given principle, is consistent with the statutory definition, the Court sees no reason to exclude reliance on the principle. Accordingly, while GAAP does not supersede the statutory definition, applicability of GAAP may ultimately depend on the precise attempted use of GAAP. For instance, Defendant asserts that § 66.002(6)(B)(i) expressly incorporates the generally accepted accounting principle that gross revenues exclude revenue not received. *See ECF No. 88* at 23. The Court addresses this provision in greater detail later.

While the Court recognizes that GAAP may apply when consistent with the statutory definition, it disagrees with Defendant's suggestion or argument that an independent audit by a public accounting firm verifying accurate financial reporting, *see ECF No. 73* at 22, has any definitive bearing on claims asserted in this case. Like the applicability of GAAP in general, the relevancy or impact of such an independent audit may ultimately depend on the facts and circumstances of the audit.

For these reasons, the Court grants the City's motion to the extent Plaintiff seeks a declaration that GAAP do not supersede the statutory language.

**D. Advertising Revenue**

Plaintiff characterizes its declaratory judgment request regarding advertising revenue in two ways: (1) "TWC may not subtract advertising commissions from revenue for purposes of franchise fee payments made to the City under Chapter 66" and (2) "advertising commissions (as that phrase is used on TWC's internal accounting records and advertising invoices) shall not be netted against gross revenue even if TWC did not actually receive such revenue." *ECF No. 76* at

2; *ECF No. 91* at 20.

TWC explains that it receives two types of advertising revenue: (1) when it sells advertising spots ("spots") directly to advertisers and (2) when it sells spots to third-party advertising agencies. TWC invoices the two types of revenue similarly, except that invoices to an advertising agency ("Agency Invoices") deducts an "Agency Commission" from the "Airtime Total" to obtain a "Net Total," which would equal the "Balance Due." On the other hand, TWC invoices sent to advertisers directly ("Direct Invoices") contain no deduction thus making the Airtime Total the same as the Balance Due.

For the first type of advertising revenue, TWC records the full amount received as gross revenue and does not deduct commissions paid. That type of revenue is not at issue in this case. In some respects, the second type of revenue might not be at issue because Plaintiff has dropped some issues involving third parties and advertising. Based on the summary judgment briefing, there is only one remaining issue regarding advertising revenue (as differentiated from advertising allocation addressed later). And that issue centers around the parties' distinct views as to exactly what transpires when TWC sells spots to an advertising agency.

Relying on invoice documentation, Plaintiff views the sequence as TWC omitting advertising commissions from its gross revenue calculations. *See ECF No. 76* at 5-6. It characterizes TWC's actions as "netting advertising commissions." *See ECF No. 91* at 20, 24-28. The theory is that commissions paid to third party agencies constitute revenue for TWC, the cable provider itself. TWC views Plaintiff's arguments as attempting to convert discounts to advertising agencies into additional franchise fees. *See ECF No. 104* at 6-8.

From a statutory interpretation perspective, two broad legal principles flow from the definition of gross revenues under Chapter 66 of PURA. First, under Tex. Util. Code § 66.002(6)(A),

23

gross revenues broadly include all consideration derived by TWC from the operation of its cable service. But Paragraph (B)(i) broadly removes from the definition "any revenue not actually received" by TWC. The exclusion of § 66.002(6)(B)(i) is not contingent on the revenue being billed or qualifying as bad debt. Bad debt is merely an example of revenue that is billed but not received.

"According to dictionaries, 'receive' means to 'be given, presented with or paid (something).' Similarly, the word means 'to take possession or delivery of'; it implies that 'something comes or is allowed to come' into one's possession." *Thomason v. Metro. Life Ins. Co.*, 165 F. Supp. 3d 512, 518 (N.D. Tex. 2016) (quoting *Phillips v. Metro. Life Ins. Co.*, 405 S.W.3d 880, 901 (Tex. App. –Dallas 2013, no pet.)), *aff'd*, 703 F. App'x 247 (5th Cir. 2017). Thus, in its ordinary use, actual receipt means that TWC has taken possession of the revenues. At times, Plaintiff uses the term "realized," which the Court equates to actual receipt.

Gross revenue of TWC does not include "any revenue not actually received" by TWC. Read in combination, the clear maxim is that TWC does not derive consideration that it does not receive. The Court finds this maxim clear from the unambiguous statutory language.[7] Of course, creative accounting and labeling does not control as to whether TWC actually received revenue. A provider cannot avoid including received revenue by labeling the revenue as something else.

The remainder of the two paragraphs supplement that maxim by further delineating what does and what does not constitute gross revenue under Chapter 66. One inclusion in gross revenue is a pro rata portion of advertising revenue, which is "based on the number of subscribers in the municipality divided by the total number of subscribers in relation to the relevant regional or national compensation arrangement." *See* Tex. Util. Code § 66.002(6)(A). The pro rata allocation

---

[7] While there is no need to consider the legislative history, the maxim is equally supported therein. *See ECF No. 104-1 (House Research Organization bill analysis)* at 9. Similarly, although the Court reached its conclusion regarding the plain language of the statute without resort to the amicus briefing, it notes that its independent conclusion is consistent with the position of the Texas Attorney General. *See ECF No. 101*.

includes "all revenue derived" by TWC "pursuant to compensation arrangements for advertising" and is expressly made "subject to Paragraph (B)(iii)." *See id*. But Paragraph (A) also contains a specific prohibition relied upon by the City: "Advertising commissions paid to third parties shall not be netted against advertising revenue included in gross revenue." *Id*. Defendant contends that this prohibition is still subject to the broad exclusion that gross revenue does not include revenue not received.

First, it should be noted that the prohibition only concerns advertising revenue that is included in gross revenue. Thus, if the statute excludes advertising revenue from gross revenue for whatever reason, then the prohibition on netting commissions is immaterial and inapplicable. Second, the commissions must be paid to a third party. And third, the statute neither defines advertising commissions nor third parties. "According to Black's Law Dictionary, the ordinary or plain meaning of a 'commission' would be 'a fee paid to an agent or employee for a particular transaction, usu[ally] as a percentage of the money received from the transaction.'" *Casanova v. Gold's Tex. Holdings Grp., Inc.*, No. 5:13-CV-1 161-DAE, 2016 WL 1241548, at *5 (W.D. Tex. Mar. 23, 2016) (quoting Black's Law Dictionary (10th Ed. 2014) in context of interpreting the Fair Labor Standards Act). This definition is consistent with the statutory text interpreted here, except that paying an employee would not be paying a third party as that term is normally understood. The ordinary meaning of third party "clearly must exclude the[] first and second parties," *Gentry v. Flint Eng'g & Const. Co.*, 76 F.3d 95, 96 (5th Cir. 1996), which in this case would be TWC (the cable provider) and the advertiser. Further, in interpreting other statutory text, courts routinely use "the term 'third party' to refer to actions against persons other than the employer." *Medina v. Herrera*, 927 S.W.2d 597, 604 (Tex. 1996). Similarly, an employee of the first or second parties would not be a third party for purposes of the prohibition on netting commissions paid to third

parties.

Thus, for purposes of § 66.002(6), "commissions paid to third parties" are fees paid to third-party agents for particular transactions. Because the statute does not expressly require the payer of the commission to be the cable provider, the payer could theoretically be either the provider or the advertiser. If the cable provider pays the commission after it actually receives advertising revenue, it cannot subtract them from the advertising revenue when calculating the pro rata allocation. If the provider effectively pays a commission prior to actual receipt of advertising revenue, there is no need to reduce the received revenue by the amount of the commission because the provider did not actually receive any additional revenue. Similarly, to the extent an advertiser might be the payer of a commission to a third-party, such payment does not qualify as revenue to the cable provider because § 66.002(6)(B)(i) excludes any revenue not actually received. Because such payments do not qualify as advertising revenue for the provider, there is no revenue to net the payment against.

Next, the Court dispels the notion that a discount to an advertising agency is necessarily excluded from gross revenues under Tex. Util. Code § 66.002(6)(B)(iii). That provision only excludes "refunds, rebates, or discounts made to subscribers, leased access providers, advertisers, or a municipality." An advertising agency differs from the actual advertiser. That provision could apply had TWC discounted the amount due from an advertiser, but those are not the facts presented here. Of course, if a discount reduces the amount of revenue received rather than being applied after receipt, subparagraph (i) would exclude the non-received portion from gross revenues.

Under the Court's interpretation of the statutory language, whether TWC may subtract commissions from advertising revenues depends on whether it has actually received the revenue. Received advertising revenue is included in gross revenues through the pro rata allocation

mechanism once TWC receives the revenue. To permissibly reduce their gross revenues, cable providers may take several steps to reduce the revenue received. For example, they may charge a lower fee for advertising whether this reduction is considered a discount or merely a lower price. They may provide an upfront reduction in amount collected by reducing owed advertising revenue by a standard percentage or amount whether they label it a commission or not. They may also take some actions to reduce gross revenues after receipt through refunds, rebates, or discounts made to certain identified persons or entities. But they may not reduce received advertising revenue by subtracting advertising commissions paid to third parties.

For these reasons, regardless of how Plaintiff characterizes the relevant declaratory judgment, it is not entitled to summary judgment on its declaratory judgment request regarding advertising revenue. For purposes of Chapter 66, the Court is unable to declare as a matter of law that TWC may not subtract advertising commissions from revenue. Nor can it declare that receipt of revenue does not matter with respect to netting advertising commissions against gross revenue. TWC is entitled to summary judgment on such requests for declaratory judgment.

Under the facts, it is at best uncertain whether TWC may subtract advertising commissions from revenue for purposes of franchise fee payments made to the City under Chapter 66. It depends on whether TWC had received the advertising revenue when it does the subtraction. While the invoices suggest that the commissions are subtracted prior to receipt of advertising revenue, the Court is not prepared to foreclose evidence regarding what revenue was received and when commissions were subtracted. Consequently, TWC is not entitled to summary judgment on alleged statutory violations based on under-reported advertising revenue.

**E. Unreturned Equipment Fees**

Plaintiff also characterizes its requested declaratory judgment regarding unreturned

equipment fees in two ways: (1) "any revenue derived from unreturned equipment fees must be included as revenue for purposes of franchise fee payments made under Chapter 66" and (2) "unreturned equipment fees must be included in gross revenue when realized." *ECF No. 76* at 2; *ECF No. 91* at 20.

Initially, two time periods were at issue with respect to unreturned equipment fees because Defendant began including such fees in its gross revenues in 2016. Plaintiff, however, has now limited its claims regarding unreturned equipment fees to prior to 2016. Defendant explains that it did not include such fees in its gross revenues because (1) the realization rate was very low and did not meet collectability threshold for revenue under GAAP; (2) "in many instances, bills for unreturned equipment were never paid"; and (3) "in the rare instances where TWC received money for unreturned equipment prior to 2016, it did not recognize it as 'gross revenues' because it treated unreturned equipment as 'surplus equipment' no longer in use on its cable system." *ECF No. 73* at 19. As support it relies on its answer to an interrogatory asking about unreturned equipment. *See ECF No. 73-12 (Exhibit 17)*. The last sentence to that interrogatory answer also adds: "Charges for unreturned equipment are not charges to receive cable service, but are imposed on persons who no longer take cable service from TWC and fail to return equipment." *See id*.

Unless excluded by Paragraph (B), fees for unreturned equipment qualify as gross revenue. The statutory definition of gross revenues controls, not any collectability threshold under GAAP. That the realization rate was low merely goes to the amount of revenue that should be included. And the fact that bills were often unpaid goes to whether the fees are excluded as not received. As should be clear by now, fees that are not received by TWC are excluded under Paragraph (B)(i). So the only remaining issue is whether received fees are excludable under subparagraph (x), which excludes "sales of capital assets or sales of surplus equipment that is not used by the purchaser to

receive cable services or video services from [TWC]."

The Court sees a significant difference between a sale of surplus equipment and a fee for not returning equipment. Although Defendant may have treated unreturned equipment as surplus, the last sentence of the interrogatory answer indicates that Defendant imposed the fee on former customers rather than treated it as a sale of equipment. Moreover, Defendant's internal accounting records presented by Plaintiff show that cash adjustments were noted using codes for unreturned equipment rather than a sale of surplus equipment. *See ECF No. 91-32 (Sealed Ex. J-14)* at TW 018256. In addition, Defendant's corporate representative characterized the fee as "basically [a] replacement charge," because when the former customer does not return equipment, then TWC has "to go out and buy" new equipment. *See ECF No. 91-27 (Sealed Ex. D)* at 76:7-11.

Given the statutory language and facts of this case, Plaintiff is entitled to a declaration that unreturned equipment fees must be included in gross revenue when realized unless the fees are otherwise excludable under the statute. Here, Defendant relies on the exclusion of Paragraph (B)(x) and there is a genuine dispute of material fact as to whether the exclusion applies on the facts of this case. Thus, Defendant is not entitled on summary judgment for Plaintiff's claims based upon revenue from unreturned equipment.

## F. Advertising Revenue Allocation

Defendant contends that Plaintiff wrongly alleges that it improperly omitted "free" and "bulk" subscribers from its advertising revenue. *ECF No. 73* at 37. It explains that it omitted "free subscribers" because the pro rata allocation for advertising revenue "cannot include any persons receiving cable service for free because 'gross revenues' exclude revenue derived from 'the provision of cable services or video services to customers at no charge,' as well as 'any revenue not actually received.'" *Id*. (quoting § 66.002(6)(B)(vii) and (i)) (emphasis deleted). It further explains

that it omitted "bulk subscribers" because the statute does not address them and the City's apparent reliance on an optional bulk subscriber formula is misplaced under the statute. *Id*. Defendant, therefore, argues that it "could not have violated Texas law by declining to use an 'optional' formula – even if it theoretically mattered, which it does not." *Id*. at 38.

Plaintiff focuses on the allocation provision for advertising revenue in § 66.002(6)(A), which is based on the number of subscribers. *ECF No. 91* at 29-30. It first submits that the unambiguous purpose of the provision is to properly account for advertising revenue based on the number of subscribers who can see the advertisements. *See id*. at 29. It thus argues that, because both free and bulk subscribers can see the advertisements, they are counted in the allocation provision. *See id*. at 29-30. It further argues that TWC's concession that it omits free and bulk subscribers creates a genuine dispute of material fact as to how many subscribers were omitted. *See id*. at 30.

The statute neither defines "subscribers" nor limits it to paid subscribers through Paragraph (A). The statute also does not address bulk subscribers. Reading Paragraph (A) in isolation, the allocation provision clearly applies to all subscribers. It does not matter whether the subscribers pay for cable services. It does not matter whether they are considered a bulk subscriber. The clear intent is to obtain an accurate ratio by counting all subscribers within a particular municipality and calculating a ratio from the subscribers within the relevant region.

Defendant relies on § 66.002(6)(B)(i) and (vii) to avoid including non-paying subscribers. But the reliance on Paragraph (B)(i) is off the mark when it comes to deciding whether non-paying subscribers are included within the pro rata allocation calculation. While the advertising revenues must be received, cable providers receive such revenue from advertisers and advertising agencies, not from subscribers. Thus, the fee-paying status of the subscriber does not matter with respect to Paragraph (B)(i). And, with respect to Paragraph (B)(vii), the fact that gross revenues do not

include the provision of cable services to customers at no charge appears markedly distinct from securing advertising revenue as defined in Paragraph (A).

The statute clearly wants to apportion advertising revenue based upon the pro rata share of municipal subscribers in a given region. To accurately calculate the pro rata allocation requires an accurate count of all subscribers. Free and bulk subscribers undoubtedly count in the allocation. Because Defendant has conceded that it omits such subscribers from its calculations, it is not entitled to summary judgment on this issue. By not including free or bulk subscribers, Defendant has inaccurately calculated the advertising allocation. At this point, the Court need not determine whether an apartment complex with one hundred rented units counts as a single subscriber or one hundred subscribers.

### G. Under-Reported Subscriber Revenue

Defendant also moves for summary judgment on Plaintiff's claim that Defendant under-paid subscriber revenue from 2006 through 2017. *ECF No. 73* at 16-19, 38-39. It contends that the City's results from a different audit demonstrate that the City's premise for this claim is knowingly false. *Id.* at 38.

Despite Defendant's confidence in its position, it has not carried its burden to show a lack of a genuine dispute of material fact. Plaintiff, furthermore, has adequately refuted Defendant's contention. *See ECF No. 91* at 30-33. Because there is a genuine dispute of material fact on this claim, Defendant is not entitled to summary judgment on it.

### H. Other Requests for Declaratory Judgment

As noted earlier, Plaintiff requests various declaratory judgments in this case. Although Defendant purports to seek summary judgment of all claims of Plaintiff, *see ECF No. 73* at 22, it does so only through its invocation of laches and waiver. When Defendant addresses the merits of

Plaintiff's various claims, Defendant fails to address each request for declaratory judgment. In general, a party cannot obtain summary judgment on a claim not addressed in its motion. This case presents no reason to address claims not raised in Defendant's motion for summary judgment.

## VII. MONEY HAD AND RECEIVED

Defendant also moves for summary judgment on Plaintiff's claim for money had and received. *ECF No. 73* at 44. Plaintiff explains that it brought this claim to "receive 'the full amount of Franchise fees owing pursuant to [PURA].'" *ECF No. 91* at 33 (quoting FAC ¶¶ 37-38; SAC ¶¶ 35-36).

"A case for money had and received looks solely to whether the defendant holds money that belongs to the plaintiff." *Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC*, No. CV H-12-1206, 2016 WL 7496743, at *2 (S.D. Tex. Dec. 31, 2016). Texas courts apply the ordinary principles of common law:

> The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him. Again, it has been declared that a cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely at the inquiry, whether the defendant holds money, which belongs to the plaintiff.

*Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (quoting *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687-88 (1951)). Such a claim "is equitable in nature" and "is not premised on wrongdoing, but looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015) (internal quotation marks and citations omitted).

In essence, Defendant merely relies on its failed defenses (laches and waiver) and conclusory statements to avoid this claim. But viewing the evidence in the light most favorable to

Plaintiff, the Court finds that Defendant has not shown that it is entitled to judgment as a matter of law on the City's money-had-and-received claim. At the very least, a genuine dispute of material fact exists as to whether Defendant holds money which belongs to the City as a matter of equity and good conscience. Consequently, granting summary judgment on this claim is improper. *See Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 246-47 (5th Cir. 2020) (per curiam).

## VIII. ATTORNEY FEES, COSTS, AND PRE-JUDGMENT INTEREST

Defendant also asserts that Plaintiff is not entitled to attorney fees, costs, or pre-judgment interest. *ECF No. 73* at 45. It argues that Plaintiff can no longer rely on the Texas Declaratory Judgment Act for costs or fees, the federal Declaratory Judgment Act does not provide statutory authority, and nothing in Chapter 66 of PURA permits prejudgment interest. *See id*. In response, Plaintiff appears to agree that it lost those remedies upon removal of this action but attempts to rely on Tex. Util. Code § 66.015(a) for such remedies. *See ECF No. 91* at 35-36.

Based on Plaintiff's response, summary judgment is warranted on the fees and costs sought under the Texas Declaratory Judgment Act. But, in its First Amended Complaint, the City generically seeks "Costs of court," "Attorneys' fees as provided by law," and "Pre- and post-judgment interest as allowed by law." *See FAC* ¶¶ 45-47. Defendant has not shown that that it is entitled to judgment as a matter of law on any of these generic remedies.

Furthermore, in its proposed Second Amended Complaint and in response to Defendant's motion for summary judgment, Plaintiff relies on § 66.015(a) for such remedies. At this point it is premature for Plaintiff to rely on § 66.015(a) whether the Court grants leave to file the Second Amended Complaint or not. That section, titled "Compliance," states:

> Should the holder of a state-issued certificate of franchise authority be found by a
> court of competent jurisdiction to be in noncompliance with the requirements of

33

> this chapter, the court shall order the holder [sic] a state-issued certificate of franchise authority, within a specified reasonable period of time, to cure such noncompliance. Failure to comply shall subject the holder of the state-issued franchise of franchise authority to penalties as the court shall reasonably impose, up to and including revocation of the state-issued certificate of franchise authority granted under this chapter.

This provision does two distinct things. First, it mandates the court to set a reasonable "period of time" to cure noncompliance with Chapter 66. Second, it sets out mandatory "penalties as the court shall reasonably impose," for a "[f]ailure to comply."

This provision does not require a pre-pled penalty for the Court to impose for a failure to comply. And, even if it did, there is no apparent reason why Plaintiff's present requests for fees, costs, and interest could not be considered in that respect. Notably, although both parties treat the mandatory penalty portion of § 66.015(a) as penalties for noncompliance with Chapter 66, that portion could be interpreted as setting out penalties for failing to timely comply with the court order to cure the noncompliance with Chapter 66. This latter interpretation flows well with the tense and provides an explanation for the use of "Failure to comply" instead of "Noncompliance." The latter opening would better convey that the Legislators wanted "Failure to comply" to refer to the Chapter 66 noncompliance rather than a failure to comply with the court directive to cure the noncompliance.

## IX. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** *TWC's Motion for Summary Judgment* (ECF No. 73) and **GRANTS IN PART AND DENIES IN PART** *City of San Antonio's Motion for Partial Summary Judgment* (ECF No. 76). It grants TWC's motion to the extent Plaintiff seeks (1) a declaratory judgment that TWC may not subtract advertising commissions from revenue or that receipt of revenue does not matter with respect to netting advertising commissions against gross revenue and (2) fees and costs under the Texas

34

Declaratory Judgment Act. It grants the City's motion to the extent Plaintiff seeks a declaration that (1) GAAP do not supersede the statutory language and (2) unreturned equipment fees must be included in gross revenue when realized unless the fees are otherwise excludable under the statute. It otherwise denies both motions.

The Court, furthermore, has accepted Plaintiff's dropping of certain claims in this action through its briefing and its proposed Second Amended Complaint. In doing so, it has not issued any ruling on the pending motion to amend. That motion and a motion for sanctions remain before the Magistrate Judge. Based on the Court's rulings herein, the following claims are dismissed from this action with prejudice:

(1) dropped or abandoned declaratory judgment claim regarding categories (ii), (v) and (vi) set out in the First Amended Complaint;

(2) dropped or abandoned claims for unpaid franchise fees based on either (i) under-reported package early termination fees or (ii) unreported third-party advertising fees;

(3) claim regarding unreturned equipment to franchise fee payments made by TWC prior to 2016;

(4) declaratory judgment that TWC may not subtract advertising commissions from revenue or that receipt of revenue does not matter with respect to netting advertising commissions against gross revenue; and

(5) fees and costs sought under the Texas Declaratory Judgment Act.

**IT IS SO ORDERED this 31st day of March 2021.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**